UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
_____ DIVISION

No. _____

| | | |
|---|---|---|
| SOUTH CAROLINA WILDLIFE FEDERATION, SOUTH CAROLINA COASTAL CONSERVATION LEAGUE and AUDUBON SOUTH CAROLINA, Plaintiffs, | ) ) ) ) ) ) | |
| v. | ) ) | **COMPLAINT** |
| SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION; ELIZABETH MABRY, Executive Director, SCDOT; FEDERAL HIGHWAY ADMINISTRATION, and ROBERT L. LEE, Division Administrator, FHWA, Defendants. | ) ) ) ) ) ) ) | |

## INTRODUCTION

1.     This action challenges violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., in connection with defendants' decision to authorize, fund and otherwise advance construction of the Briggs-DeLaine-Pearson Connector.  This highly controversial $100-million-dollar project would consist of a 9.6 mile roadway and bridge through the Upper Santee Swamp and Lake Marion, in Calhoun and Sumter Counties, South Carolina.  The proposed Connector would degrade and destroy significant natural resources in one of the largest remaining wildlife habitats in South Carolina, while serving no demonstrated transportation purpose.

2.      As discussed more fully below, this lawsuit is prompted by the deficient final environmental impact statement ("FEIS") prepared for the Connector by the South Carolina Department of Transportation ("SCDOT") and Federal Highway Administration ("FHWA") and FHWA's subsequent issuance of a Record of Decision ("ROD") approving the FEIS and authorizing further development of and construction of the Connector.

3.      Under NEPA, the defendants are required to prepare an environmental impact statement that accurately identifies the underlying purpose to be served by the project; thoroughly examines the project's environmental and social impacts; and rigorously explores and objectively evaluates reasonable alternatives to the project. The Connector FEIS fails all three requirements. From a flawed and internally inconsistent statement of purpose and need, the FEIS proceeds to present an incomplete and materially misleading portrait of the Connector's impacts, both positive and negative. These defects, in turn, lead to an "analysis" of alternatives so slight and empty as to make the chosen alternative—to build the Connector—nothing more than a *fait accompli*. In carrying out this flawed NEPA process, the agencies committed serious procedural errors, including failing to publish or address comments and information demonstrating that the project's impacts and costs will be greater than acknowledged, and showing that less damaging alternatives exist.

4.      The fundamental flaws in the FEIS make it an unlawful platform for the issuance of a final decision approving the Connector project. Issuance of the ROD was therefore contrary to law, arbitrary and capricious, and constituted an abuse of discretion under § 706(2)(A) of the Administrative Procedure Act. 5 U.S.C. §§ 551-706 (2002).

Accordingly, this Court should vacate the ROD and require the preparation of a full and accurate FEIS that objectively evaluates the underlying purpose for the Connector, its impacts, and feasible alternatives that will actually meet the transportation infrastructure and economic development needs of citizens living in a historically underserved area of South Carolina.

## JURISDICTION AND VENUE

5.      This action arises under NEPA, 42 U.S.C. § 4321 et seq.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and may issue declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Plaintiffs are entitled to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

6.      Venue is proper in this Court and in the Charleston Division pursuant to 28 U.S.C. § 1391(e) and Local Civil Rule 3.01(A)(1) DSC, because a substantial part of the events or omissions giving rise to the claims herein occurred in the Charleston Division of this Court, and defendants conduct business related to the events and omissions herein alleged within the Division.

## PARTIES AND STANDING

### Plaintiffs

7.      Plaintiff South Carolina Wildlife Federation ("SCWF"), an affiliate of the National Wildlife Federation, is a nonprofit citizens' conservation organization founded by sportsmen in 1931.  SCWF advocates environmental stewardship by promoting wildlife habitat enhancement and long-term natural resources conservation.  In furtherance of its mission, SCWF conducts activities including reviewing and commenting on agency permit and policy decisions; encouraging protection of public

lands and natural areas for all South Carolinians to experience; and working with individuals, groups, clubs and others with an interest in hunting and fishing to ensure that these resources are available for future generations to enjoy.

8.     SCWF counts 5,200 hunters, fishermen, birders, naturalists, gardeners, and environmentalists among its members, with many residing in the Charleston Division. SCWF and its members have a direct interest in ensuring that the environmental impacts of the Connector are properly and fully analyzed, documented, and disclosed to the public.  SCWF members regularly use and enjoy Lake Marion, the Upper Santee Swamp, and other natural areas in the vicinity of the Connector for birding, boating, hiking, fishing, hunting, and simple enjoyment.  SCWF's members support maintaining the area's natural and environmental integrity, so that they may continue to use and enjoy one of the last large intact natural areas in central South Carolina in the future.  These interests would be impaired the Connector project's impacts, which include destruction and fragmentation of natural habitat, traffic noise from vehicles traveling on the Connector, and degradation of water quality, as well as land use changes in the area that project proponents claim the project will induce.

9.     Plaintiff South Carolina Coastal Conservation League ("the League"), founded in 1989, is a grassroots non-profit conservation organization headquartered in Charleston, South Carolina.   The League's mission is to protect the natural environment of the South Carolina coastal plain and to enhance the quality of life of its communities by working with individuals, businesses and government to ensure balanced solutions to natural resource stewardship issues. The League seeks to fulfill this mission through education, research, advocacy, and other efforts.  In furtherance of this mission, the

League actively communicates with government agencies and the general public on matters related to the conservation of South Carolina's natural resources.

10.    The League represents approximately 4,000 members across the state, including ordinary citizens, nature lovers, environmentalists, birders, hikers, kayakers, campers, fishermen and hunters.  The League and its members have a direct interest in ensuring that the environmental impacts of the Connector are properly and fully analyzed, documented, and made public.  Members of the League regularly visit and use the Upper Santee Swamp, Lake Marion, and the surrounding lands, wetlands and waters that would be impacted by the Connector for activities such as hiking, bird watching, photography, hunting and fishing.  Over the years of its existence, the League has sponsored several kayak trips to this location to highlight the spectacular remoteness and beauty of the site.  If the Connector is built, the interests of League's members in continuing to use and enjoy the areas surrounding the project site in the future would be irreparably damaged.

11.    Plaintiff Audubon South Carolina ("Audubon SC"), an affiliate of the National Audubon Society ("National Audubon"), is a not-for-profit corporation founded in 1905 and headquartered in the town of Harleyville in Dorchester County, South Carolina, within the Charleston Division.  National Audubon's mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity.  In furtherance of this mission, it maintains a national network of community-based nature centers and chapters, engaging millions of people of all ages and backgrounds in positive conservation experiences and educating them about important natural resources.

12.    Audubon SC currently has approximately 4,700 members in South Carolina, including members who live in the general vicinity of the proposed Connector, as well as members from across the state.  Audubon SC's members visit, recreate, conduct research in, observe birds and other wildlife, conduct educational activities in, photograph, and otherwise use and enjoy the public lands, wetlands, and other lands and waters in the vicinity of the proposed Connector.  Audubon SC's members plan to continue these activities in the future.

13.    National Audubon has extensive expertise in identifying important bird habitat, assessing threats to that habitat, and analyzing trends in bird populations.  To that end, National Audubon and Audubon SC are identifying a network of sites that provide critical habitat for birds.  This effort is known as the Important Bird Areas ("IBA") Program.  Audubon SC's Program has designated 36 IBAs in South Carolina, including the Upper Santee Swamp, Congaree National Park, and the Santee National Wildlife Refuge, all in close proximity to the proposed Connector.

14.    The Connector will disrupt bird activity in the area, causing bird populations to scatter and disperse and possibly move to other areas.  Such disruption and reduction in numbers will preclude Audubon SC's members and scientists from observing, photographing, studying and enjoying the birds.  These negative impacts on bird populations, coupled with the project's other environmental impacts, will adversely affect the interests of Audubon SC's members in maintaining the environmental integrity of the project site and surrounding natural areas.

15.    Plaintiffs and their members experience important educational, scientific, cultural, recreational, aesthetic, and other benefits from their use of these natural areas.

Plaintiffs and their members have interests which are adversely affected and irreparably harmed by the actions of defendants in failing to properly and fully assess, document and publish the true environmental impacts of the Connector, including the defendant's misstatement of project purpose, inadequate assessment of costs and benefits, and incomplete analysis of alternatives.  These actual and potential injuries, including injuries to their procedural rights, which have been and continue to be caused by the illegal actions and decisions of defendants with respect to the Connector, will be redressed by an order from this Court vacating the ROD for the FEIS for the Connector, requiring defendants to pursue proper and adequate environmental documentation for the proposed project, and ordering the other relief sought in this action.

**Defendants**

16.    Defendant South Carolina Department of Transportation is an agency of the State of South Carolina that has offices and does business throughout the state, including in the Charleston Division of this Court.  SCDOT, which is responsible for complying with NEPA before proceeding with projects that involve a major federal action, acted as lead co-author of the inadequate FEIS challenged in this lawsuit, and an official of SCDOT signed the FEIS.  SCDOT is relying on the FEIS to pursue permits for this project.

17.    Elizabeth Mabry is the Executive Director of SCDOT.  Ms. Mabry had supervisory authority over SCDOT's participation in the preparation of the inadequate FEIS challenged in this action and for SCDOT's decision to proceed with the challenged project despite this inadequate environmental analysis.  Ms. Mabry is sued in her official capacity.

18.     The Federal Highway Administration is a federal agency within the U.S. Department of Transportation that does business throughout the state of South Carolina, including in the Charleston Division of this Court.  FHWA was responsible for overseeing the preparation of the flawed FEIS challenged in this action and for ensuring that this document complied with NEPA.  Further, FHWA issued the illegal ROD approving the FEIS, also challenged in this action.

19.     Robert L. Lee is the South Carolina Division Administrator for FHWA. Mr. Lee had the final authority for FHWA's preparation and approval of the FEIS and ROD challenged in this action and for FHWA's decision to authorize and commit funds for the challenged project despite this inadequate environmental study.  Mr. Lee is sued in his official capacity.

## LEGAL BACKGROUND

20.     The National Environmental Policy Act requires agencies to prepare or adopt an environmental impact statement before undertaking a major federal action that will significantly affect the quality of the human environment.  42 U.S.C. § 4332(2)(C).

21.     The EIS serves several functions.  First, it ensures that an agency takes a hard look at a proposed project's environmental effects.  Second, it guarantees that the agency consider reasonable alternatives to the proposed project that may have fewer adverse impacts on the environment before deciding whether to undertake the project. Finally, the EIS presents detailed information about a proposed project, its impacts, and its alternatives, to the public, so that it may participate in the decision-making process.

22.     To implement the requirements of NEPA, the Council on Environmental Quality has promulgated regulations applicable to all federal agencies.  See 40 C.F.R.

§§ 1500-1508 ("the CEQ regulations").  FHWA has promulgated supplemental

regulations and procedures for complying with NEPA.  See 23 C.F.R. § 771.101.

 23. The CEQ regulations implementing NEPA require that an EIS contain a

statement of purpose and need for the proposed action which "shall briefly specify the

underlying purpose and need to which the agency is responding in proposing the

alternatives including their proposed action."  40 C.F.R. § 1502.13.

 24. NEPA requires an agency to include in an EIS a "detailed statement" on

"alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  In this statement, the

agency must rigorously explore and objectively evaluate all reasonable alternatives that

could achieve the underlying project purpose.  40 C.F.R. § 1502.14(a).  This alternatives

analysis is "the heart of the environmental impact statement."  40 C.F.R. § 1502.14.

 25. The EIS must be prepared with objective good faith and must fully and

fairly discuss the adverse environmental effects of the proposed action.  42 U.S.C. §

4332(2)(C); 40 C.F.R. § 1502.1.  These environmental effects include both direct and

indirect effects.  The CEQ regulations define "direct effects" as effects "which are caused

by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a). The

regulations define "indirect effects" as effects "which are caused by the action and are

later in time or farther removed in distance, but are still reasonably foreseeable."  40

C.F.R. § 1508.8(b).

 26. The CEQ regulations provide that an agency preparing a final EIS "shall

assess and consider comments" on the draft EIS and "shall respond" to those comments

in one of several specified ways, including making requested modifications, corrections

and supplementations.  40 C.F.R § 1503.4(a).  If the agency decides the comments do not

warrant further agency response, it must so declare, "citing the sources, authorities or reasons which support the agency's position." 40 C.F.R. § 1503.4(a)(5). The CEQ regulations also state that "[a]ll" substantive comments received on the draft statement, or summaries of those comments if appropriate, should be attached to the final EIS, "whether or not the comment is thought to merit individual discussion." 40 C.F.R. § 1503.4(b).

## FACTS

### Project Setting and History

27.     At an estimated cost of $100 million, the Briggs-DeLaine-Pearson Connector (formerly named the "Calhoun/Clarendon Causeway" and the "James E. Clyburn Connector") would be constructed between the small communities of Rimini (1990 population within two-mile radius, 286) and Lone Star (1990 population within two miles, 601). These two communities are, and have always been, separated by the approximately 3-mile wide floodplain of the Santee River, now partially impounded by the upper reaches of Lake Marion. As approved in the ROD, the Connector includes a 9.6 mile roadway, including a 2.8 mile long bridge through the Upper Santee Swamp, with road termini in Calhoun and Sumter Counties.

28.     The Connector would be constructed in an area that includes vast stretches of federally and state-protected upland forest, bottomland hardwood swamps, and various other wetland and riparian ecosystems constituting the Upper Santee Swamp and related features of Lake Marion and its tributaries, the Congaree and Wateree Rivers. The Upper Santee Swamp, also known as Sparkleberry Swamp, is a central component of the largest remaining unbroken wildlife habitat in central South Carolina, serving as a critical link

between Congaree National Park and the Santee National Wildlife Refuge.  Together, this assemblage is recognized as the Congaree-Wateree Santee Basin Initiative, a unit of the North American Waterfowl Management Plan.  Other significant protected and undeveloped areas in the vicinity include the vast wetland area at the confluence of the Congaree and Wateree Rivers; Milford Plantation; Manchester State Forest; Poinsett State Park; Poinsett Electronic Combat Range; and Santee-Cooper Natural Areas.  (A map showing the key natural areas surrounding the project site is attached to this Complaint as Exhibit 1.)

29.     Construction and operation of the Connector would destroy over 15 acres of wetlands and degrade water quality in the Upper Santee Swamp and Lake Marion; fragment wildlife habitat currently uncrossed by highway traffic; and degrade the solitude and wilderness value of a nationally significant natural area.

30.     Roads and bridges and the vehicles using them cause a wide range of adverse environmental impacts, including both direct and indirect effects on individual plant and animal species and broader effects on ecosystem structure and function.  These negative effects include direct habitat destruction, wildlife mortality from vehicles, invasion by exotic species, human-caused fires, dispersal of pathogens, degradation of air and water quality, chemical contamination, and noise.  In addition to terrestrial and avian wildlife, aquatic species are significantly impacted by sedimentation, shading, toxic runoff and other water quality impacts from roads and bridges.

31.     Roads and bridges also destroy and fragment wildlife habitat.  Many wildlife species need large areas of undisturbed habitat to thrive; the incursion of roads, however, divides large landscapes into smaller patches and converts forest interior habitat

into edge habitat.  Animal behavior, including movement patterns, reproductive success, escape behavior, and mortality, is altered by the presence of roads.  Bird communities in particular are negatively affected even hundreds of meters from the actual roadway and related human activity.

32.     There has never been a road connection across the Upper Santee Swamp between Lone Star and Rimini.  Since the late 1890s, a railroad line has crossed the Upper Santee Swamp near the project site, and pre-existed Lake Marion by approximately 40 years.  The railroad experiences four train crossings per day.  In contrast, an estimated 5,200 vehicles would use the proposed Connector each day.  This car and truck traffic would directly impede and deter wildlife crossing; would cause increased wildlife mortality; and would, through noise pollution and other related impacts, degrade wildlife habitat outside the immediate right of way.

33.     The four-county area around the project faces significant economic challenges and has been historically underserved by public infrastructure of all types.  Schools in the area are substandard and the area lacks treated drinking water or sewer service.  Existing roads in the area, while adequate in terms of capacity, are in need of repair.  According to U.S. Census Bureau data, approximately one quarter of households in the immediate project area do not have automobiles.  The area has experienced a decrease in population over the last several decades.  One of the few recognized economic opportunities in the area comes from nature-based travel and tourism centered on the Upper Santee Swamp and its abundant natural resources.

34.     SCDOT, too, faces significant economic challenges.  The agency's 20-year needs assessment, conducted in January 2005, revealed a statewide needs shortfall of

$2.6 billion per year in 2004 dollars.  The state's annual construction and safety shortfall is now approximately $1.3 billion, the mass transit shortfall $590 million, and the highway maintenance shortfall $567 million.  Numerous safety, maintenance and bridge replacement projects have been deferred because of the funding shortfall.  According to SCDOT, South Carolina's highways are the fifth deadliest in the country.

35.     SCDOT must, by law, prepare a long-range transportation plan identifying the highway construction priorities of the State.  23 U.S.C. § 135.  The plan lists a number of projects in the four-county area that constitute the identified transportation needs for the area.  A map showing the location of these projects, as well as the proposed Connector, is attached as Exhibit 1.  The Connector is not in SCDOT's transportation plan as an identified transportation priority for the area.

36.     Defendant Mabry, chief executive of SCDOT, has advised the Governor of South Carolina that the Connector is not a SCDOT priority.

37.     This project received initial federal authorization as an earmark in the Transportation Equity Act for the 21st Century.  The statute specified "Construct Calhoun/Clarendon Causeway."  Pub. L. No. 105-178; 112 Stat. 107 (June 9, 1998).

38.     Pursuant to that authorization, the FEIS for the Connector was completed in 2002, and the ROD was issued in 2003.  The project lay dormant—with no permit applications submitted to state or federal regulators—until August 5, 2005, when it received a $16.08 million earmark in the "Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users" ("SAFETEA-LU").  Pub. L. No. 109-59; 119 Stat. 1144 (Aug. 10, 2005) (codified at 23 U.S.C. § 117 (2006)).

39.    On February 3, 2006, the U.S. Army Corps of Engineers and South

Carolina Department of Environmental Control issued a public notice that SCDOT had

submitted a wetlands fill and water quality certification permit application for the

Connector, notwithstanding the Connector's absence on the area transportation plan and

statements of SCDOT's chief executive that the project is not a transportation priority.

SCDOT's permit application incorporated by reference the FEIS and ROD issued for the

Connector.

**The Flawed NEPA Process**

40.    On October 22, 2001, SCDOT and FHWA issued a Draft Environmental

Impact Statement ("DEIS") for the Connector.

41.    Along with many individual citizens, a number of conservation

organizations submitted comments critical of the DEIS and project, including SCWF, the

League, and Audubon SC, as well as Ducks Unlimited and the South Carolina Chapter of

the Sierra Club.

42.    On December 13, 2001, the Southern Environmental Law Center

("SELC") submitted voluminous comments on the DEIS on behalf of SCWF and the

League.  SELC's comments raised a number of substantive issues, including the

impermissibly narrow purpose and need, inadequate range of alternatives considered, and

failure to evaluate adequately the environmental impacts of the project.  SELC's

comments included a project-specific report by Dr. Asad Khattak, a transportation expert

at the University of North Carolina, critiquing the transportation and economic data and

analysis contained in the DEIS.  Dr. Khattak's analysis repudiated the stated

transportation rationale for the project, demonstrated that the techniques used to assess

the project's transportation value were inadequate, and showed that SCDOT's own data indicated that the project would lose money for several decades.

43.     Numerous state and federal agencies also submitted comments on the DEIS voicing significant concerns about the project's impacts to nationally significant natural resources in the area, and detailing inadequate documentation of project impacts in the DEIS.

44.     The U.S. Fish and Wildlife Service submitted comments on December 12, 2001 complaining that the DEIS, among its other failures, contained numerous substantial flaws, including a mismatch between the proposed project and the stated purpose and need, and insufficient detail concerning impacts on wetland and terrestrial habitats, including water, noise, and light pollution.

45.     On December 14, 2001, the U.S. Environmental Protection Agency submitted comments that sharply criticized the DEIS's faulty analysis of, *inter alia*, project alternatives, air quality impacts, water quality and wetlands impacts, endangered species impacts, noise impacts, and hazardous waste impacts.

46.     By letter dated December 18, 2001, the South Carolina Department of Natural Resources expressed serious concerns regarding, among other things, the project's impacts on migratory waterfowl and other wildlife, including direct habitat loss due to clearing and shading, increased vehicular traffic, and noise.

47.     The comments submitted by the National Marine Fisheries Service on December 27, 2001 pointed out the need for additional information on fisheries, aquatic resources, endangered and threatened species, wetland habitat functions, and specific plans for mitigation of the project's impacts on wetlands and aquatic resources.

48.     The South Carolina Department of Health and Environmental Control ("DHEC") Bureau of Land and Waste Management ("Bureau") submitted comments on the DEIS by letter dated November 15, 2001, noting that Build Alternate 1 (the FEIS's preferred alternative) had the potential to disturb contaminated soils at the Safety-Kleen Pinewood hazardous waste landfill, and that the Bureau therefore recommended that further environmental testing be performed at the Safety-Kleen site.

49.     An internal SCDOT memorandum dated April 1, 2002 states that an Initial Site Assessment had been conducted for the Connector project and that SCDOT's consultant had determined that four sites in the project area warranted an investigation into possible hazardous material contamination, including a site used by the Safety-Kleen company for transfer of materials associated with their hazardous waste landfill ("Site 2").

50.     An internal SCDOT memorandum dated April 18, 2002 states that an attorney for Safety-Kleen had advised SCDOT's consultant that Safety-Kleen did not want soil or groundwater samples collected from Site 2 because of the possibility of exposing Safety-Kleen to scrutiny by DHEC if the site were found to be contaminated. The memo states that an agreement was reached to not proceed with collecting soil and groundwater samples from Site 2 at that time.

51.     A subsequent undated internal SCDOT memorandum reports the results of a Phase II Environmental Assessment of previously identified sites in the Connector project area, but does not mention the Safety-Kleen site.

52.     On December 5, 2002, defendants SCDOT and FHWA issued a final environmental impact statement ("FEIS") for the Connector.

53.    The FEIS failed to cure almost all of the substantial omissions and misstatements of the DEIS, including those pointed out by the agencies, citizens and interested groups.  Defendants failed to publish in full SELC's comments on the DEIS, including the report of Dr. Khattak, and did not respond to Dr. Khattak's report.  The FEIS stated that a Phase II Environmental Assessment had not been completed for the Safety-Kleen site.

54.    Numerous agencies and environmental groups submitted comments criticizing the FEIS' failure to address significant concerns raised in comments on the DEIS, and reiterating those concerns as applied to the inadequacies of the FEIS.

55.    On June 12, 2003 FHWA completed the NEPA process by issuing the ROD approving the FEIS.

56.    On March 17, 2006, FHWA published a notice in the Federal Register that purports to impose a new 180-day statute of limitations for challenges to all prior Federal agency decisions regarding the Connector.  71 Fed. Reg. 13893 (March 17, 2006).  That notice set September 13, 2006, as the deadline for the filing of this action challenging the FEIS and ROD.

### CLAIMS FOR RELIEF

**First Claim for Relief:**
Use of an Impermissibly Narrow Purpose and Need To Constrain
the Alternatives Analysis in the FEIS

57.    Paragraphs 1 through 56 are incorporated by reference.

58.    The CEQ regulations require that an EIS contain a statement of purpose and need for the proposed action that "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including their

proposed action." 40 C.F.R. § 1502.13. The statement of purpose and need drives the

entire EIS process, since it frames the range of alternatives to the specific project

proposal that must be evaluated in the FEIS.

59.    The FEIS prepared for the Connector by defendants articulates the

following primary underlying purpose and need: "to improve economic conditions in the

four-county region of Calhoun, Clarendon, Orangeburg and Sumter Counties, improving

mobility, access and connectivity throughout the region by providing a new, more direct

crossing of Lake Marion between Calhoun and Clarendon Counties." FEIS at 1-1.

60.    By defining the project purpose with reference to a specified

transportation outcome notwithstanding the stated underlying transportation or economic

goal to be achieved, defendants illegally constrained the analysis of project alternatives

and converted their "preferred alternative" into an inescapable conclusion, in violation of

NEPA and its implementing regulations.

**Second Claim for Relief:**
Defendants Failed To Consider a Reasonable Range of Alternatives in the FEIS

61.    Paragraphs 1 through 60 are incorporated by reference.

62.    As discussed above, the CEQ regulations implementing NEPA require that

agencies rigorously explore and objectively evaluate all reasonable alternatives to a

proposed action. 40 C.F.R. § 1502.14(a). This "is the heart of the environmental impact

statement." 40 C.F.R. § 1502.14.

63.    Defendants failed to rigorously explore and objectively evaluate

reasonable alternatives to the proposed Connector in the FEIS, including a "no-action"

alternative; other alternatives that could help to improve mobility in the four-county

region and that would have a greater chance of promoting economic development, such

18

as the priorities identified in the transportation plan; and functional alternatives to the bridge and roadway, such as other public infrastructure projects that could help to address the underlying purpose to promote economic development in the area.

64.     The alternatives analysis in the FEIS consists of an examination of the same facility—a two-lane roadway with bridge over Lake Marion—arranged in two slightly different positions only hundreds of yards apart.  Rather than a "reasonable range" of alternatives, the FEIS presented essentially the same option twice, thereby avoiding any real inquiry into other options that could improve "mobility, access and connectivity throughout the region," such as safety enhancements, in the area.

65.     SCDOT was well aware that the local road system in this sparsely populated rural area is not overburdened or near capacity.  Given no demonstrated need for this project (i.e., no showing that existing roads near the project are congested or otherwise inadequate), defendants should have fully explored a "no-action" alternative for this project as required under NEPA. 40 C.F.R. § 1502.14(d).

66.      Defendants' failure to rigorously explore and objectively evaluate reasonable alternatives to the proposed Connector violates NEPA and its implementing regulations, and is arbitrary, capricious, and otherwise contrary to law.

**Third Claim for Relief:**
The Preferred Alternative Will Not Fulfill the Project Purpose

67.     Paragraphs 1 through 66 are incorporated by reference.

68.     A primary purpose of the Connector stated in the FEIS is "to improve economic conditions in the four-county region of Calhoun, Clarendon, Orangeburg and Sumter Counties improving mobility, access and connectivity throughout the region by

19

providing a new, more direct crossing of Lake Marion between Calhoun and Clarendon Counties." FEIS at 1-1.

69.     SCDOT's own research, incorporated by reference in the FEIS, reveals that the Connector would not appreciably improve mobility, access or connectivity in the region, and would in fact shave only three to ten minutes off the hour-long drive between the county seats of Orangeburg and Sumter. Further, SCDOT ignored information in the record documenting that the number of users of the selected alternative would be so small as to make the cost/benefit ratio for the project negative for years to come.

70.     In addition, the FEIS concluded that the Connector would fail to bring meaningful economic development to the area. Indeed, the FEIS itself acknowledges that "[w]hile a bridge crossing would make the region more competitive for development, other conditions, such as the development of sewer and water service, the creation of buildable sites, and additional incentives for developers may be needed in order for development interest to occur." FEIS at 1-2.

71.     As noted above, the second part of the stated project purpose, "to meet the intent of the Congress of the United States, as indicated by section 1602 of the Transportation Equity Act for the 21st Century, which provides for a new crossing of Lake Marion between Calhoun and Clarendon Counties," improperly prescribes the range of alternatives so as to make the project a *fait accompli*. To the extent the limitation is upheld, however, the selected alternative (between Calhoun and Sumter Counties) fails to provide a crossing "between Calhoun and Clarendon Counties."

72.     Defendants' selection of a preferred alternative that they concede will not fulfill the project purposes stated in the FEIS—either the underlying purposes of

20

connectivity and economic development, or the specific two-county location for the

project identified by Congress—was arbitrary, capricious, and otherwise not in

accordance with law.

**Fourth Claim for Relief:**
Defendants Failed To Analyze Adequately the Environmental Impacts of the Connector,
Including Both Direct and Indirect Impacts

73.     Paragraphs 1 through 72 are incorporated by reference.

74.     As discussed above, NEPA requires that every EIS must analyze the direct

and indirect environmental impacts of the proposed action. In violation of NEPA, the

FEIS for the Connector fails to adequately assess and disclose these impacts.

75.     The FEIS fails to include an adequate analysis of the proposed

Connector's direct impacts to wildlife, forest health, water quality, hydrology, soil

productivity, hazardous waste sites, wetlands, and endangered species, among other

environmental resources, despite repeated calls for bolstered analysis by the public and

numerous resource agencies.  Potential impacts to these resources include sedimentation,

human-caused fires, habitat fragmentation, predation, road-kill, invasion by exotic

species, light and noise pollution, dispersal of pathogens, and chemical contamination,

among others.

76.     The FEIS fails to acknowledge, analyze, or disclose the indirect impacts of

the proposed Connector on the environment, including the potential for growth-inducing

effects, even though such potential is cited as a primary reason for the project.  The FEIS

evades this indirect impacts analysis by asserting that the surrounding land will not be

developable because it is dedicated to natural resource use, when in fact many private

tracts of land do exist in the vicinity of the proposed Connector.  The FEIS failed further

to assess impacts on Shaw Air Force Base due to the project's proximity to Poinsett Electronic Combat Range.

77.     Defendants' failure to take a hard look at the social and environmental impacts of the proposed action and to disclose this information in the FEIS—even though the project would be sited in the middle of an assemblage of state and nationally important natural areas, and only miles away from a National Wildlife Refuge and South Carolina's only National Park—violates NEPA and its implementing regulations, and is arbitrary, capricious, and otherwise not in accordance with law.

**Fifth Claim for Relief:**
Failure To Respond to Comments Submitted on the Draft FEIS

78.     Paragraphs 1 through 77 are incorporated by reference.

79.     When preparing a final EIS, an agency "shall assess and consider comments" on the draft EIS and "shall respond" to those comments in one of several prescribed manners, including making requested modifications, corrections and supplementations.  40 C.F.R § 1503.4(a).

80.     If the agency decides the comments do not warrant further agency response, it must so declare, "citing the sources, authorities or reasons which support the agency's position." 40 C.F.R. § 1503.4(a)(5).

81.     The Southern Environmental Law Center, on behalf of plaintiffs SCWF, the League and others, submitted extensive comments on the draft EIS in December of 2001.  SELC's comments included and discussed an economic and transportation analysis commissioned for this project and conducted by Dr. Asad Khattak.  Dr. Khattak's report points out the serious shortcomings of the transportation and economic data and analysis contained in the DEIS, and indicates the project will be a money-loser.

82.     The final EIS does not respond to Dr. Khattak's critique or conclusions.

83.     Defendants' failure to respond in the FEIS to comments received on the DEIS violates NEPA and its implementing regulations, and is arbitrary, capricious, and otherwise not in accordance with law.

**<u>Sixth Claim for Relief</u>:**
<u>Failure To Publish Comments Submitted on the Draft FEIS</u>

84.     Paragraphs 1 through 83 are incorporated by reference.

85.     The CEQ regulations also state that "[a]ll" substantive comments received on the draft statement, or summaries of those comments if appropriate, should be attached to the final EIS, "whether or not the comment is thought to merit individual discussion."  40 C.F.R. § 1503.4(b).

86.     As stated above, SELC submitted comments that contained in full the economic and transportation analysis commissioned for this project, conducted by Dr. Asad Khattak.

87.     The final EIS does not include the text, substance or summary of Dr. Khattak's analysis.

88.      Defendants' failure to publish in the FEIS comments received on the DEIS deprived the public and decision-makers of information critical to a full analysis of the proposed project; violates NEPA and its implementing regulations; and was arbitrary, capricious, and otherwise not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

a.      Enter a declaratory judgment that the defendants violated the National Environmental Policy Act by preparing an inadequate FEIS that states an impermissibly narrow project purpose, fails to consider a reasonable range of alternatives, identifies a preferred alternative that will not accomplish the project purpose, fails to adequately analyze and disclose the environmental impacts of the proposed project, and fails to publish or respond to comments on the DEIS;

b.      Vacate the Record of Decision for the challenged project;

c.      Enter appropriate injunctive relief to ensure that the defendants comply with the National Environmental Policy Act, and specifically to ensure that defendants take no further actions toward proceeding with the challenged Briggs-DeLaine Pearson Connector until they have complied with NEPA;

d.      Award plaintiffs the costs of this action, including their reasonable attorneys' fees; and

e.      Grant such other relief as the Court deems just and proper.

Respectfully submitted,

_____
/S/ J. Blanding Holman
J. Blanding Holman (D.S.C. # 9805)

SOUTHERN ENVIRONMENTAL LAW CENTER
200 W. Franklin St., Suite 330
Chapel Hill, NC 27516-2520
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

*Attorney for Plaintiffs*

24